2021 IL App (1st) 200109-U

THIRD DIVISION
December 22, 2021

No. 1-20-0109

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 08 CR 14331 |
| | ) | |
| VERNON LAUDERDALE, | ) | Honorable |
| | ) | Joseph M. Claps & Ursula Walowski |
| Defendant-Appellant. | ) | Judges Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Justices Ellis and Burke concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The trial court's dismissal of defendant's petition for postconviction relief at the second stage affirmed where defendant failed to make a substantial showing of actual innocence or ineffective assistance of counsel.

¶ 2     Following a bench trial, defendant, Vernon Lauderdale, was found guilty of attempted first degree murder and sentenced to a term of 31 years' imprisonment, which included an additional term of 25 years for personally discharging a firearm that proximately caused great bodily harm to

another person. This appeal arises from defendant's postconviction petition raising claims of ineffective assistance of trial counsel and actual innocence. The trial court allowed one claim—that trial counsel was ineffective for allegedly misleading and threatening defendant into waiving his right to testify—to proceed to a third stage evidentiary hearing, and dismissed the remaining claims at the second stage of proceedings. After an evidentiary hearing in which both defendant and his trial counsel testified, the trial court denied defendant's remaining postconviction claim, finding counsel's testimony denying defendant's allegations credible, and further finding no evidence to support defendant's claim that counsel misled or threatened him. Defendant appeals the trial court's judgment, arguing that he made substantial showings of ineffective assistance and actual innocence.

¶ 3    The following evidence was presented at defendant's bench trial, which was set out in the direct appeal from defendant's conviction. *People v. Lauderdale*, 2012 IL App (1st) 100939.

"Prentis Smith testified that he was a former member of the Mickey Cobra street gang. He joined in 1978 when he was eight years old and left the gang in 1996. While in the gang, he achieved the rank of a 'prince.' He identified defendant in court as someone he had known for 20 years. Smith was best friends with defendant's brother. Smith admitted that he was convicted of home invasion in 1998.

On the afternoon of July 20, 2008, Smith testified that he was 'on Sedgwick in the Cabrini area.' He was in a parking lot with his 16-year-old cousin Deondre Daley and Ryan Myles. Daley is also defendant's nephew. During the afternoon, at around 2 or 3 p.m., Smith 'had words' with a man called 'Shooter.' Smith tried to punch Shooter, but missed and Shooter ran. Smith stated that the dispute was over

selling drugs in the parking lot. As Shooter left the parking lot, Smith observed Shooter make a phone call, but did not know whom Shooter called.

Later, at approximately 10 p.m. that night, Smith testified that he was in the parking lot with Daley and Myles. Smith and Daley had remained in the parking lot continuously, but Myles had left and returned. He stated that there were 'quite a few people in the parking lot.' Smith said it was dark outside, but there were lights on two buildings around the parking lot. Smith observed a confrontation between defendant and Daley. Defendant said that it was his parking lot. Smith asked if they moved to Dominick's, was that defendant's too, and defendant responded that it was. Smith stated that defendant pushed Daley to the ground. Smith then punched defendant in the jaw. Smith denied having any weapons on him.

After Smith punched him, defendant reached to his left side and pulled out a dark-colored .32–caliber revolver. Smith testified that he was standing approximately two feet from defendant, that they were 'close enough to touch.' Smith stated that defendant aimed the gun at Smith's chest and pulled the trigger two times, but the gun did not fire. Smith testified that he said to defendant, 'somebody [gave] you a gun with no bullets.' Defendant then stepped back and aimed for Smith's left leg and shot him in the left leg. Defendant then shot Smith in the right leg. Defendant aimed the gun at Smith's chest and Smith turned to the side as defendant shot Smith in the shoulder. Smith stated that he 'turned to the side to avoid getting shot in [his] heart.' Smith estimated that defendant was three feet away from him when the shooting occurred. Smith stated that all three shots were

3

fired in less than five seconds. Smith testified that he stood there in shock. He said defendant 'took off running' and 'was hollering, "Cobra crazy." '

Smith testified that he started to run toward Evergreen, but he blacked out and fell to the ground. He stated that Daley, Myles and Shawn Childs put him in the backseat of Smith's car and took him to the Lincoln Park Hospital. He was later transferred to Illinois Masonic Hospital and treated for three gunshot wounds. He stated that he still has two bullets lodged in his body.

The next day, July 21, 2008, Smith spoke with the police at the hospital and he told them that defendant shot him. Smith was later shown a photo array and he identified defendant in the array. Later, in April 2009, Smith testified that he visited defendant in the Cook County jail with defendant's mother and cousin. Smith stated that defendant apologized and said he did not mean to shoot Smith in the chest and was not trying to kill Smith. According to Smith, defendant said defendant would 'take care of me [Smith] if I drop [*sic*] the charges.' Smith interpreted this to mean money. Smith had no further contact with defendant.

Detective Marc Leavitt testified that on July 20, 2008, he was assigned to investigate a shooting. He met with Smith at the hospital and Smith told him that defendant was the person who shot him. On July 21, 2008, the detective met with defendant in custody. He advised defendant of his *Miranda* rights and defendant agreed to speak with him and his partner. Detective Leavitt asked defendant if he belonged to a gang and defendant responded that he used to be a Mickey Cobra.

Chandra Bell testified that on July 20, 2008, at around 9 p.m., she was in the area of 1300 North Sedgwick in Chicago. She was in the area to visit her mother

4

and to look for her two sons. She found her sons in the parking lot on Sedgwick. After she spoke with her sons, Bell talked to Smith for about five minutes. Bell stated that she had known Smith all of her life and had known defendant for 15 years. Bell observed defendant walk up to Smith, but she was unable to hear what they were saying and was not paying attention to them. Bell was walking toward her mother's house when she heard shots fired. She said she ran and saw defendant running 25 to 30 feet away from her with something in his hand, but she was unable to see what it was. Bell also saw Smith being put into a car.

Following Bell's testimony, the State rested. Ryan Myles testified for the defense. Myles admitted that at the time of his testimony, he was in custody for 'a drug charge,' serving a sentence of four years in the Illinois Department of Corrections. Myles stated that he had known Smith for about two years and Smith is his godmother's cousin. He said he knew defendant the same way. Myles has known Daley his whole life.

On July 20, 2008, Myles testified that he was at 1365 North Hudson, which he estimated is about a block and a half from the 1310 North Sedgwick. Myles denied being in the parking lot with Smith that afternoon. He denied seeing an altercation between defendant and Smith. While at the Hudson address, Myles heard gunshots at around 10 p.m. Myles then began running in the direction of the shots. He stated that he went toward the gun shots because he wanted to check on Daley. Myles ran toward Evergreen and Sedgwick. He then saw Smith on the ground. He did not see anyone with Smith. Myles went to get Smith's car and then

he saw Daley and Shawn Childs 'coming out.' They helped Myles put Smith in the car.

The defense then called Kizzy McRay to testify about her knowledge of defendant and Smith as well as her knowledge of the Mickey Cobra gang. The State objected to this line of questioning as McRay was not a member of the gang. The trial court allowed the State to *voir dire* McRay on her qualifications as an expert in Chicago gangs. McRay was allowed to testify.

McRay testified that she is defendant's older sister. She has also known Smith for over 20 years and he is a close friend. Smith was best friends with her deceased older brother, Leon Daley. McRay stated that Leon was a member of the Mickey Cobra gang and he held the rank of 'supreme.' McRay learned about the gang signs displayed by the Mickey Cobras by being around her brother and his friends. She did not know of 'any of [defendant's] involvement in being a Mickey Cobra.'

McRay identified various gang signs displayed by Smith in three pictures presented by the defense. McRay testified that Smith was still a member of the Mickey Cobras. McRay then stated that Smith came to her house in June and July 2008 seeking to recruit her son into the gang. McRay admitted that she was not present at the time of the shooting and that she told the investigator from the public defender's office that she did not believe defendant committed the shooting. Following McRay's testimony, the defense rested." *People v. Lauderdale*, 2012 IL App (1st) 100939, ¶¶ 4-16.

¶ 4    Based on the above evidence, the trial court found defendant guilty of attempted first-degree murder, further finding that he personally discharged a firearm during the offense that proximately caused great bodily harm. Defendant was sentenced to six years imprisonment for attempted first degree murder, and a 25-year mandatory enhancement for personally discharging the firearm, for a cumulative sentence of 31 years' imprisonment.

¶ 5    On direct appeal, defendant alleged that that his trial counsel was ineffective for failing to seek sentencing under section 8-4(c)(1)(E) of the Criminal Code, which allows the trial court to sentence a defendant for a Class 1 felony, as opposed to a Class X felony, if at sentencing the defendant proves by a preponderance of the evidence that at the time of attempted murder he was acting under a sudden and intense passion resulting from serious provocation. This court rejected defendant's argument, finding the record did not contain evidence of either serious provocation or mutual combat to support his contention. This court noted that the evidence at trial showed that defendant approached Smith and Daley, defendant pushed Daley to the ground, and Smith then punched defendant in the jaw. In retaliation, defendant pulled out a gun and fired it at Smith five times, and striking him three times. This court observed that defendant's response to being punched once was " 'out of all proportion' to Smith's provocation" and the evidence did not support defendant's argument that his attorney should have requested a mutual combat instruction.

¶ 6    Thereafter, on April 11, 2013, defendant filed a *pro se* postconviction petition alleging that he was denied the effective assistance of trial counsel. Specifically, defendant alleged that he told counsel he was acting in self-defense, that he gave trial counsel the names of individuals who could support that defense, and that counsel failed to interview or call those witnesses to testify. Defendant also claimed that he told counsel that he wanted to testify, but that counsel disagreed, threatened to withdraw if defendant insisted on testifying, and told defendant that the trial court

would not appoint a new attorney. In support, defendant attached his own affidavit and an affidavit from Leondre Daley.[1]

¶ 7     In defendant's affidavit, he averred that on July 20, 2008, he approached Smith and was speaking to him about how he needed to "stop beating up on the younger guys" in the neighborhood. Daley walked up and "interrupted the conversation," telling defendant that they would "f*** up" anyone they wanted to, "including [defendant]." Defendant told Daley that he "wasn't addressing him," and Smith "sucker punched [defendant] in the jaw." Defendant stated that Daley "began to hit [him] with a crutch" and Smith continued to swing "wildly." Defendant asserted that he "saw guys running towards [him]" and was "swarmed by attackers while trying to pull the gun [he] always carried for protection." Defendant "fired the shots to end the beating [he] was taking," and the "crowd scattered." Defendant ran away, because he knew that Smith and others "kept guns nearby."

¶ 8     Defendant further averred that he informed his lawyer of the above, and when asked if there were any witnesses, defendant gave counsel the names of Daley, Shawn Childs, and Caprice Willingham, and the nick names "Lil Woo" and "Lil George." Defendant gave counsel the phone number and addresses for Daley and Childs, and the phone number for Willingham. Defendant also told counsel he could find the individuals "in that same parking lot," or through Daley. Additionally, defendant's mother and sister "would help if need be." After the trial defendant learned that his lawyer "hadn't contacted any of the witnesses."

---

[1] We note that Daley's name is spelled both "Daley" and "Dailey" in various places in the record on appeal. We will use the spelling "Daley," for consistency with the prior appeal in this case.

¶ 9    Defendant further stated that he told counsel that he wanted to testify, but after the prosecution rested, counsel told defendant that he "didn't think the State had prove[n] its case so he wasn't gonna call [defendant] to the stand." Counsel told defendant that the court would consider defendant's criminal background and "gang ties" if he testified. Counsel told defendant that "as it stood," defendant "would be acquitted," but if defendant testified, the trial judge would "automatically convict" him. Defendant further averred that counsel told him that if he testified, defendant would "have to admit shooting [Smith]," and that the court would "ignor[e]" his self-defense claim. Counsel and defendant argued, and counsel "grew angry." Defendant told counsel that he "believed it would be best if [he] testified," and counsel told defendant that he would withdraw from the case if he did. Counsel told defendant that he would have to represent himself because the trial judge would not appoint new counsel for him "mid-trial."

¶ 10    In Daley's affidavit, he stated that on July 20, 2008, he was with Smith and defendant when they began arguing. Daley averred that Smith "swung on" defendant, and Daley, who was using crutches at the time, "started swinging [his] crutch at" defendant. "More guys" then came to "help" Smith, and defendant "stumble[d] back and pull[ed] out a gun." Daley "took off hopping without [his] crutches" and yelled that defendant had a gun. Daley then heard three gunshots. Daley further stated that he was subpoenaed by the State, but was not "used in the case." He was not contacted by the defense, or interviewed by a defense investigator. Had he been contacted, Daley stated that he would have testified consistent with his affidavit.

¶ 11    The circuit court appointed post-conviction counsel, who filed an amended post-conviction petition and Supreme Court Rule 651(c) certificate, and attached affidavits from Shawn Childs and Anthony Williams, who witnessed the incident. In the amended petition, defendant argued that trial counsel was ineffective for failing to interview Daley and Shawn Childs, who defendant

alleged would have supported his theory of self-defense. Defendant also claimed that he was actually innocent based on the affidavits of Childs, Daley and Williams, and that if counsel had been unable to interview Childs and Daley, their affidavits constituted "newly discovered" evidence. Defendant further argued that trial counsel was ineffective for failing to file a motion pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984), to introduce evidence of Smith's violent character. Finally, defendant asserted that trial counsel was ineffective for failing to present available evidence at trial that may have shown defendant was acting under a sudden and intense provocation so as to permit sentencing as a Class 1 offender.

¶ 12    In his affidavit, Childs averred that he knew Smith and defendant. On the day of the shooting, Childs saw defendant come to the parking lot and have a discussion with Smith, during which Smith threatened to beat up and shoot defendant. Childs averred that he saw Smith "hit [defendant] in the head" and Daley "hit" defendant with his crutch. At this point, Childs saw defendant pull out a gun and point it at Smith. Childs heard three gunshots, then saw Smith on the ground. Childs did not make any averments regarding whether he was contacted by the defense following the incident.

¶ 13    In his affidavit, Williams alleged that he saw defendant approach Smith, and the pair "walk[ed] off to the side" and were "talking for like 20 min[ute]s." At that point, Daley walked up to defendant with a crutch in his hand, and Daley and defendant were "going back and forth talking." Smith then punched defendant in the face, defendant "stumble[d] back," and Daley "started swinging the crutch." Williams averred that he and "the other guys" started running over, "but [defendant] pull[ed] out a gun and pointed it at [Smith's] legs and shot." Williams then ran away. Williams stated that he was not contacted by police or lawyers, but that he would have given a statement and testimony if he had been contacted.

¶ 14     The State filed a response to defendant's *pro se* and amended petitions for rehearing. First, the State requested an evidentiary hearing on defendant's claim that his counsel misled him as to the consequences of his testimony, at which the State could contest defendant's allegations on that issue. As to defendant's remaining claims, the State alleged that defendant failed to make a substantial showing of actual innocence or ineffective assistance of counsel. The State argued that defendant's claims generally "stem[med] from trial counsel's decision not to pursue a theory of self-defense," when the record was clear that trial counsel made a reasonable strategic choice not to pursue that claim. The State pointed out that even defendant acknowledged that counsel believed that the prosecution had not proven their case, and had advised him that that pursuing self-defense by testifying or calling witnesses "would risk bringing gang-related prejudices and [defendant's] criminal history into the case." Additionally, the State argued that "[e]ven taking [defendant]'s asserted facts as true, they would not have changed the outcome of the trial" as there was "no reason to believe that he would have succeeded in an argument of self-defense." Defendant had "made no showing that he reasonably believed deadly force necessary force to avert imminent harm," since "a punch in the face without any visible evidence that the aggressor was armed with a weapon" would not "justify the use of deadly force."

¶ 15     Though most of the post-conviction proceedings had been before the Honorable Joseph Claps, the Honorable Ursula Walowski presided over the argument on the State's motion to dismiss on September 18, 2018. During argument on defendant's actual innocence claim, Judge Walowski asked if defendant had "present[ed] self-defense," and the State replied that he had. Judge Walowski found that the proffered affidavits were cumulative, and did not present anything new that would "cause *** a different result." Judge Walowski scheduled a third-stage, evidentiary

hearing on the question of whether trial counsel had misled or threatened defendant from testifying, and dismissed the remaining claims raised in the post-conviction petition.

¶ 16    On October 29, 2019, Judge Claps conducted an evidentiary hearing, at which both defendant and his trial counsel testified.

¶ 17    Defendant testified that "[a]t [one] point," he was aware that he had the right to testify. Defendant told his counsel "every time" they talked that he wanted to testify to "dispute" Smith's testimony. Defendant said that counsel informed him that he "shouldn't testify" because counsel believed that he had impeached Smith, and if defendant testified, defendant's "background and gang ties" would come in and defendant would be "automatically convicted." Defendant said that counsel also told him he would "withdraw from [defendant's] case" and defendant would have to represent himself.

¶ 18    Arthur Willis testified that he represented defendant in his trial for attempted first degree murder. Counsel testified that he had an "ongoing conversation" with defendant about his right to testify, but denied that they ever argued, or that counsel was ever "angry," about that issue. Defendant never told counsel that he wanted to testify, and, in fact, defendant was "adamant about not testifying." Counsel did not prevent defendant from testifying, tell him that he would be "automatically convicted" if he chose to testify, or tell defendant that he would be acquitted if he did not testify. He did, however, advise defendant regarding how his background could be used by the State if he chose to testify. Counsel further testified that he never threatened to withdraw if defendant wanted to testify, nor did he tell defendant that he would have to represent himself or that the court would not appoint a new lawyer for him, as "that issue never came up." Counsel also testified that he did not instruct or direct defendant regarding how to answer the court's questions regarding his understanding and waiver of his right to testify.

12

¶ 19    On cross-examination, counsel stated that the case "would have been simpler if [defendant] testified" but defendant "chose not to testify so we had to do our defense in a different way." Postconviction counsel asked counsel if he investigated any of defendant's self-defense witnesses, and counsel replied that his investigator "interviewed the witnesses that [defendant] gave us," but counsel could not recall the names of those individuals.

¶ 20    On December 31, 2019, the trial court entered a written order denying the remaining postconviction claim, concluding that he had not shown a substantial denial of a constitutional right by a preponderance of the evidence. The court found trial counsel's testimony to be credible, further finding that defendant had "concocted" his theory of self-defense "after the trial had ended." The court also noted that defendant had been admonished regarding his right to testify, and defendant never informed the court of any threats made by counsel, and in fact, had stated that there were no threats or promises made in response to the court's questioning.

¶ 21    Defendant filed a timely notice of appeal that same day.

¶ 22    In this appeal, defendant contends that the trial court improperly dismissed certain postconviction claims. Specifically, he contends that he made a substantial showing that trial counsel was ineffective for failing to investigate and present the testimony of Daley, Childs and Williams, which he claims would have supported a theory of self-defense. Defendant also argues that his petition made a substantial showing of actual innocence based on those affidavits. Finally, defendant asserts that appointed postconviction counsel provided unreasonable assistance in failing to file a motion to reconsider the order of September 18, 2018, dismissing his actual innocence claim.

¶ 23    Initially we note that, although this matter proceeded to a third stage hearing on defendant's claim of ineffective assistance related to his right to testify, defendant has not challenged the trial

court's third stage denial of that claim. Defendant has also not provided argument as to the remaining claims in his *pro se* or amended postconviction petitions. By limiting his appellate arguments to the claims set forth above, defendant has abandoned the remaining claims set forth in his postconviction petition and amended petition, forfeiting them for review. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018); *People v. Guest,* 166 Ill. 2d 381, 414 (1995).

¶ 24    The Post-Conviction Act provides a tool by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. 725 ILCS 5/122-1(a) (West 2018); *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). Postconviction relief is limited to constitutional deprivations that occurred at the original trial. *Id*. at 380. "A proceeding brought under the [Post-Conviction Act] is not an appeal of a defendant's underlying judgment. Rather, it is a collateral attack on the judgment." *People v. Evans*, 186 Ill. 2d 83, 89 (1999). "The purpose of [a postconviction] proceeding is to allow inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal." *People v. Barrow*, 195 Ill. 2d 506, 519 (2001).

¶ 25    As set forth above, although this matter proceeded to a third stage evidentiary hearing on one claim, defendant appeals the circuit court's prior dismissal of certain claims at the second stage of proceedings. To survive a motion to dismiss at the second stage, a defendant must make a "substantial showing" that his constitutional rights were violated by supporting his allegations with the trial record or appropriate affidavits. *People v. Simpson*, 204 Ill. 2d 536, 546-47 (2001). In reviewing the second-stage dismissal of a post-conviction petition, all "well-pleaded facts in the petition and affidavits are to be taken as true, but nonfactual and nonspecific assertions which merely amount to conclusions are not sufficient to require a hearing under the Act." *People v.*

*Rissley*, 206 Ill. 2d 403, 412 (2003). Unsupported or conclusory allegations, in either the petition or the defendant's affidavit, are not enough to mandate an evidentiary hearing. *People v. Jackson*, 213 Ill. App. 3d 806, 810-11 (1991). This court reviews the dismissal of a post-conviction petition at the second stage *de novo,* and the dismissal of a petition may be affirmed for any reason supported by the record. *People v. Langston*, 342 Ill. App. 3d 1100, 1107 (2001).

¶ 26    We first turn to defendant's claim that he made a substantial showing of ineffective assistance of trial counsel for failure to investigate, and present the testimony of, witnesses who he claims would have supported a theory of self-defense.

¶ 27    Claims of ineffective assistance of counsel are resolved under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. *Strickland*, 466 U.S. at 687. Defendant's claim fails where he has failed to make a substantial showing of ineffective assistance under either prong.

¶ 28    To demonstrate performance deficiency, a defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Edwards*, 195 Ill. 2d 142, 163 (2001). In order to establish ineffective assistance of trial counsel, a defendant must first demonstrate that counsel's performance was deficient in that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the sixth amendment. *Strickland*, 466 U.S. at 687. In so doing, a defendant must overcome the strong presumption that the challenged action or inaction of counsel was the product of sound trial strategy and not of incompetence.. *Barrow*, 133 Ill. 2d at 247; *People v. Perry*, 224 Ill. 2d 312, 341-42 (2007). "A defendant is entitled to reasonable, not perfect, representation, and mistakes in strategy or in judgment do not, of themselves, render the representation incompetent." *People v. Fuller*, 205 Ill.

2d 308, 331 (2002). "In recognition of the variety of factors that go into any determination of trial strategy, courts have held that such claims of ineffective assistance of counsel must be judged on a circumstance-specific basis, viewed not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions on review." *Fuller*, 205 Ill. 2d at 330-31 (citing *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000); *Strickland*, 466 U.S. at 689).

¶ 29    Decisions concerning which witnesses to call at trial and what evidence to present on a defendant's behalf are matters of trial strategy which are "generally immune from a claim of ineffective assistance of counsel." *People v. Wilborn*, 2011 IL App (1st) 092802, ¶¶ 79, 82; *People v. Hobley*, 159 Ill. 2d 272, 305 (1994). While trial counsel "has a professional duty to conduct " 'reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary' " (*People v. Domagala*, 2013 IL 113688, ¶ 38 (quoting *Strickland*, 466 U.S. at 691)), a particular decision not to investigate " 'must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.' " (Emphasis omitted) *People v. Ganus*, 185 Ill. 2d 355, 365 (1998) (quoting *Strickland*, 466 U.S. at 691).

¶ 30    First, the record appears to rebut defendant's claim that counsel failed to investigate the witnesses that defendant requested. Although this specific claim did not proceed to the third stage evidentiary hearing, postconviction counsel nonetheless questioned trial counsel about his investigations during cross-examination at that hearing. Counsel testified that defendant provided him with information about potential witnesses, and that counsel employed an investigator who interviewed those witnesses in preparation for defendant's trial.

¶ 31    Moreover, even taking as true defendant's allegations that trial counsel did not contact the witnesses identified by defendant, defendant's own affidavit and counsel's testimony demonstrate that counsel made a strategic decision to avoid presenting a claim of self-defense. In defendant's

affidavit, he acknowledges that counsel advised him that counsel did not believe such a claim would be persuasive, and that it would require defendant to admit to the shooting. Trial counsel's testimony at the third stage evidentiary hearing corroborated that defendant and counsel had discussed this strategy before and throughout the trial proceedings.

¶ 32    The record also shows that, prior to trial, defendant filed a supplemental answer stating that defendant may raise the affirmative defense of self-defense. At opening statements at the subsequent trial, counsel stated that he expected the testimony to show that defendant "was not present at the time" Smith was shot, and that Smith's identification of defendant was not credible because there was "bad blood" between Smith and defendant. The State objected, noting that defendant had previously claimed that its defense would be self-defense, but that it "sound[ed] like [the] defense is now saying alibi." Counsel acknowledged that the defense had indicated previously that it could raise self-defense, but "at th[at] time, [counsel] d[id]n't anticipate there being testimony *** in regards to self-defense." Counsel also clarified that the defense would not be presenting alibi evidence, but would be relying on the State's "inability to prove the defendant guilty beyond a reasonable doubt."

¶ 33    Instead of calling defendant's witnesses to make an unpersuasive claim of self-defense, the record shows that counsel sought to use the witnesses' absence as a weakness in the State's case, showing that Smith's identification of defendant was uncorroborated. Specifically, counsel argued in closing:

> "No one who was allegedly in that parking lot with [Smith] *** comes in to back up his story that he had a confrontation with [defendant]. *** [Daley] doesn't come in to say yes, [Smith] stood up for me and was protecting me and that's why he got shot. *** There's no Sean Childs who comes in to testify. *** Nobody is backing

up [Smith]'s statement. And you would think that if this man got shot supporting somebody that that person would come in to testify for him. Or *** any of these individuals that he's been with *** in a parking lot, but they have nobody."

¶ 34 Based on our review of the record, it is clear that counsel considered a self-defense strategy, and decided against it. Trial counsel's decision on this point need not be perfect, and his strategic decision is not unreasonable simply because it proved unsuccessful. *People v. Barfield*, 187 Ill. App. 3d 190, 197-98 (1989). In these circumstances, defendant cannot overcome the strong presumption that counsel conduct constituted sound trial strategy. *Barrow*, 133 Ill. 2d at 247; *Perry*, 224 Ill. 2d at 341-42.

¶ 35 Additionally, we would also affirm the dismissal of the post-conviction petition on the second prong of *Strickland*, because defendant did not demonstrate prejudice. To demonstrate prejudice, the defendant must show a reasonable probability that "but for counsel's unprofessional error, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. *Strickland* requires actual prejudice be shown not mere speculation as to prejudice." *People v. Bew*, 228 Ill. 2d 122, 135 (2008); *People v. Brown*, 2015 IL App (1st) 122940, ¶ 47.

¶ 36 Defendant cannot show prejudice in the circumstances here because there is no reasonable probability that he would have been acquitted but for trial counsel's decision not to present his proposed witnesses in pursuing a claim of self-defense. Even taking the well pleaded allegations in the affidavits as true, as we are required to do at the second stage, the affidavits fail to demonstrate that that a self-defense claim would have been successful.

¶ 37    In Illinois, a person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. 720 ILCS 5/7-1(a) (West 2006). The use of deadly force is justified only when a person reasonably believes such force is necessary to prevent the use of commiserate force against themselves or another. *Id.* "While the law does not require the aggressor to be armed for self-defense to be justified, it must appear that the aggressor is capable of inflicting serious bodily harm without the use of a deadly weapon, and is intending to do so." *People v. Rodriguez*, 336 Ill. App. 3d 1, 15 (2002).

¶ 38    The affidavits fail to show that defendant was threatened with imminent deadly force, or that that he reasonably believed deadly force was necessary. The trial evidence showed that defendant had a confrontation with Daley and was punched once in the face by Smith, who was unarmed. *Lauderdale*, 2012 IL App (1st) 100939, ¶ 6. Even taking the affidavits as true, they do not rebut the trial evidence. The affidavits from Daley, Childs and Williams confirm that defendant came to the parking lot, got into a verbal altercation with Smith and Daley, was punched by Smith, and responded by drawing a firearm and shooting Smith three times. The affidavits fail to show that defendant was faced with deadly force, or that he reasonably believed deadly force was necessary to avert imminent death or deadly force against himself and, thus, defendant has failed to show he was prejudiced by any alleged deficiency in counsel's performance.

¶ 39    The only real differences between the events described in the affidavits and those described at trial is that the affiants allege that Daley swung his crutch at defendant, and they imply that it was Smith who physically escalated the interaction—unlike the trial testimony which established that defendant first pushed Daley.

¶ 40　Regardless of whether Smith threw the first punch, there is nothing in the affidavits to support a claim that Smith's punch amounted to deadly force that would support a claim of self-defense. *People v. Hawkins*, 296 Ill. App. 3d 830, 838 (1998); *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 88. Similarly, there is nothing to support a claim that Daley swinging a crutch elevated the interaction to deadly force. First, we note that the affidavits are contradictory in that Childs avers that Daley "hit" defendant with the crutch, while Daley and Williams describe Daley as "swinging" the crutch, but they do not allege that defendant was struck. Nonetheless, the fact that Daley was using crutches for mobility, and had to "hop" away without those crutches when defendant pulled out a gun, makes defendant's claim that he was faced with deadly force even more dubious. Even taking the affidavits as true, there is no reasonable probability that the result of the proceeding would have been different, and accordingly, they are insufficient to show prejudice under *Strickland*.

¶ 41　Defendant next contends that he made a substantial showing of actual innocence based on the affidavits described above.

¶ 42　A defendant who makes a post-conviction claim of actual innocence must present evidence that is (1) newly discovered; (2) not discoverable earlier through the exercise of due diligence; (3) material and not merely cumulative; and (4) of such conclusive character that it would probably change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47; *People v. Edwards*, 2012 IL 111711, ¶ 32. The conclusive character element is the more important element of a claim of actual innocence. *Robinson*, 2020 IL 123849, ¶ 47; *People v. Washington*, 171 Ill. 2d 475, 489 (1996).

¶ 43　We conclude that the circuit court properly dismissed defendant's actual innocence claim because the affidavits do not meet the "most important" requirement of an actual innocence claim.

*Robinson*, 2020 IL 123849, ¶ 47. When reviewing a post-conviction claim of actual innocence, the conclusiveness element means that the additional evidence, taken with the trial evidence, would probably lead to a different result on retrial. *Coleman*, 2013 IL 113307, ¶ 96. The question is whether the new evidence places the trial evidence in a different light and undermines the reviewing court's confidence in the verdict. *Id.* at 97. While the evidence need not be completely dispositive, a reviewing court must determine whether the supporting affidavits show that it is more likely than not that no reasonable juror would have convicted defendant. *Robinson*, 2020 IL 123849, ¶ 61.

¶ 44    As this court held above, even taking the affidavits as true, they fail to support a claim that defendant was acting in self-defense, where they do not establish that defendant faced an imminent threat of deadly force being used against him. Accordingly, the affidavits are not so conclusive that they would likely change the result on retrial. Having concluded that defendant failed to show the conclusiveness of the proffered affidavits, we need not analyze defendant's actual innocence claim under the remaining elements.

¶ 45    Finally, defendant argues that his postconviction counsel provided unreasonable assistance. Specifically, defendant contends that postconviction counsel failed to file a motion to reconsider the order of September 18, 2018, which dismissed his actual innocence claim. Defendant alleges that Judge Walowski dismissed his actual innocence claim based on a misunderstanding that defendant had raised self-defense at trial, and that counsel failed to file a motion to reconsider that order based on counsel's own mistaken belief that she could not file such a motion after Judge Claps resumed hearing the matter.

¶ 46    As our supreme court has noted, "it is settled that there is no constitutional right to assistance of counsel during postconviction proceedings." *People v. Cotto*, 2016 IL 119006, ¶ 29.

"The right to assistance of counsel in postconviction proceedings is a matter of legislative grace, and a defendant is guaranteed only the level of assistance provided by the *** Act." *People v. Hardin*, 217 Ill. 2d 289, 299 (2005). Our supreme court has concluded that the Act provides a postconviction petitioner with "reasonable" assistance. *Id.* The reasonable level of assistance provided for by the Act is "less than that afforded by the federal or state constitutions." *People v. Pendleton*, 223 Ill. 2d 458, 472 (2006).

¶ 47 Illinois Supreme Court Rule 651(c) (eff. July 1, 2017), "imposes specific duties on postconviction counsel to ensure that counsel provides that reasonable level of assistance." *People v. Kirk*, 2012 IL App (1st) 101606, ¶ 18. "The rule requires that postconviction counsel consult with the defendant to ascertain his contentions of the deprivation of constitutional rights, examine the record of the proceedings at trial, and make any amendments to the defendant's *pro se* petition that are necessary for an adequate presentation of his contentions." *Id.* "Compliance with Rule 651(c) may be shown by the filing of a certificate representing that counsel has fulfilled her duties." *Id.* ¶ 19. "The filing of a Rule 651(c) certificate gives rise to a rebuttable presumption that post-conviction counsel provided reasonable assistance." *People v. Profit*, 2012 IL App (1st) 101307, ¶ 19. "It is defendant's burden to overcome this presumption by demonstrating his attorney's failure to substantially comply with the duties mandated by Rule 651(c)." *Id*.

¶ 48 Here, postconviction counsel filed a Rule 651(c) certificate. Thus, the presumption exists that defendant received the representation required by the rule. Defendant does not specifically challenge counsel's representations in the 651(c) certificate, or identify any particular duty under Rule 651(c) with which counsel failed to comply. Instead, defendant generally contends that, notwithstanding counsel's filing of a Rule 651(c) certificate, counsel's failure to file a "meritorious motion to reconsider rebuts the presumption of reasonable assistance."

¶ 49    Even if we were to conclude that reasonable postconviction representation extends to counsel's decision regarding whether to file a motion to reconsider the dismissal of a postconviction claim, we could not find that counsel acted unreasonably here. We concluded above that defendant's actual innocence claim was properly dismissed at the second stage, and accordingly, defendant did not receive unreasonable assistance by counsel's failure to move to reconsider the dismissal of that claim.

¶ 50    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 51    Affirmed.